UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ALEXIA T. HIGGINS,<br><br>     Plaintiff,<br><br>     v.<br><br>NORTHWEST FARM CREDIT SERVICES, ACA; NORTHWEST FARM CREDIT SERVICES, PCA; and NORTHWEST FARM CREDIT SERVICES, FLCA,<br><br>     Defendants. | Case No. 4:16-cv-00400-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. OVERVIEW

This employment discrimination case comes before the Court on Defendants' Motion for Summary Judgment. Plaintiff Alexia Higgins alleges Defendants discriminated against her because she was female and pregnant. She also alleges Defendants failed to accommodate her in violation of the Americans with Disabilities Act, failed to provide her benefits under the Family Medical Leave Act, and did not pay her the same amount as her male colleagues. The Court held oral argument on the Motion on April 4, 2018. After reviewing the briefs, record, and statements made at oral argument, the Court finds good cause to GRANT the Motion for Summary Judgment and DISMISS this case in its entirety.

## II. BACKGROUND[1]

Defendants Northwest Farm Credit Services, ACA, Northwest Farm Credit Services, PCA, and Northwest Farm Credit Services, FLCA operate as a single employer or joint employer and collectively do business as Northwest Farm Credit Services (collectively "Northwest FCS"). Northwest FCS is a financial cooperative that provides financing and related services to farmers, ranchers, agribusinesses, commercial fishermen, timber producers, rural homeowners, and crop insurance customers in Montana, Idaho, Oregon, Washington, and Alaska. Northwest FCS hired Higgins in 2011. Higgins began working in Northwest FCS's Blackfoot office in early December 2011 as a "Financial Specialist" ("FS"). As a FS at Northwest FCS, Higgins provided administrative support to Northwest FCS's "Relationship Managers" ("RM") by interfacing with clients and ensuring the appropriate loan documentation and paperwork was completed.

In the fall of 2012, Higgins discovered she was pregnant with twins. In January 2013, Higgins' doctor placed her on bedrest for the remainder of her pregnancy. At the time, Higgins immediate supervisor was Kara Welch, who was the Operations Manager for the eastern Idaho region. Welch remained Higgins' supervisor until mid-February 2015.[2] Welch helped Higgins complete the necessary medical leave paperwork and

---

[1] The following facts are construed in the light most favorable to Higgins, the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

[2] At that time, Welch's doctor placed her on bed rest due to complications with her own pregnancy. Welch decided to resign after the birth of her baby, "[a]fter evaluating [her] health

assisted Higgins in making modifications to her position requirements so she could continue working from the hospital.

In the fall of 2013, Northwest FCS transferred Higgins to the Idaho Falls office. There, she acted as support staff for Cody Hendrix and Steve Smith. Around this time, Higgins began performing duties that were outside of what was typically required for a FS. For example, she engaged in Country Home Loan sales training, completed the training necessary to become a Credit Officer ("CO"), managed projects, trained new staff, and performed a variety of other tasks necessary to assess, assemble, and close loan packages.

In May of 2014, Higgins applied for an open CO position. Lance Zollinger, the Senior Vice President of Lending for eastern Idaho, would supervise the position. During the first round of interviews, Higgins interviewed with Zollinger, Welch, Hendrix, and Smith. Zollinger recommended that Higgins and two male candidates advance to the second round of interviews. During the second round, Higgins interviewed with Idaho President Blair Wilson and Executive Vice President Fred DePell. Zollinger was also in the room during the interview. DePell made the final decision as to who would fill the position. Northwest FCS hired an outside candidate named Matt Macedeo for the CO position. Northwest FCS says it selected Macedo because he expressed a strong interest in moving into a RM position in the future and that was a quality it likes COs to possess.

---

and pregnancy, as well as [her] future." Welch continued to work from home when possible until mid-April, a few days before her baby was born.

In contrast to Macedo, Northwest FCS states that Higgins clearly indicated in her interview that she did not have any interest in moving into a RM position.

Welch was very interested in seeing Higgins advance within Northwest FCS. Accordingly, after Northwest FCS did not hire Higgins for the CO position, Welch asked Higgins if she would be interested in a new position in which she would be responsible for marketing and producing Country Home Loans ("CHL").[3] They had previously discussed that CHLs were a severely underutilized product at Northwest FCS. After Higgins and Welch conceptualized what would eventually become the CHL RM position, Welch approached Zollinger and proposed that Higgins transition into marketing and producing CHLs for eastern Idaho. Zollinger approved of the proposal. Wilson and DePell then also approved the proposal.

In late August 2014, Higgins moved into a FS II role as part of her transition into the CHL RM. Higgins received a mid-year 15% raise to $44,160. On March 1, 2015, Northwest FCS promoted Higgins into the CHL RM position (an RM I position) and gave her a raise to $50,000.

Higgins alleges Northwest FCS treated her differently than the other RMs in eastern Idaho. Higgins did not have any designated support staff on site in her new RM position. Rather, Northwest FCS assigned Jaime Oliver, a woman working at a different branch who was already supporting three other RMs, as support staff. All of the other RMs in eastern Idaho had designated support staff on site. Higgins was also required to

---

[3] Country Home Loans are loans designated for residences and have a maximum loan value of $269,000.

travel much more, and cover a larger geographic region, than the other RMs in eastern Idaho to service loan inquires and customers. Northwest FCS initially assigned Cody Hendrix, an RM in the Idaho Falls office, to answer Higgins questions as she transitioned into the RM role. Hendrix was unable to answer Higgins' questions about CHLs, so Higgins requested an off-site mentor. Northwest FCS assigned Alison Jenkins, an RM based in Nampa, Idaho, to act as Higgins off-site mentor. However, Higgins' attempts to "reach out and get answers from Alison Jenkins were unfruitful." Dkt. 25-1, at 19. When Higgins complained to Zollinger about the relationship, Zollinger encouraged Higgins to continued reaching out to her.

In late summer 2015, Higgins learned that she was pregnant. At the time, Northwest FCS was in the process of adding a CHL RM position in northern Utah. Higgins was supposed to train the new CHL RM, Cody Montgomery, starting in the late fall/early winter of 2015. When Higgins told Zollinger she was pregnant, Zollinger told Higgins that the timing was "unfortunate" and "less than favorable conditions" because Higgins was supposed to provide support to the new Utah CHL RM soon. Dkt. 25-1, at 17. Zollinger also questioned whether it was in Higgins' family's best interest for her to return to work after having a third child. *Id.* at 22.

On September 8, 2015, Northwest FCS notified Higgins and 154[4] other employees via email that they were required to complete and return a form authorizing Northwest FCS to obtain information about their criminal background, financial responsibility,

---

[4] There is some discrepancy about whether 145 or 155 employees were required to fill out this form.

character, and general fitness in order to comply with the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"). Dkt. 23-3, at 33. Northwest provided these employees with the authorization form, a list of answers to frequently asked questions, and an FCRA Summary of Rights. *Id.* at 5. Previously, in January of 2014, Northwest FCS had required 208 employees to complete this form. All 208 employees had complied. Following a "comprehensive assessment of job duties," after Northwest FCS completed a structural "realignment" in late 2014, early 2015, it determined that the additional 155 employees also needed to complete the form. Northwest directed the 155 employees to complete and return the form by September 21, 2015. Dkt. 23-3, at 33.

Higgins was one of 28 employees that did not complete the form by the deadline. *Id.* at 5. On October 2, 2015, Jeff Brown, Northwest FCS's Assistant General Counsel, emailed these 28 employees a written reminder to complete the form at their "earliest convenience." *Id.* at 44.

Higgins responded to Brown's email that day. *Id.* at 47. She expressed her concern that there was no requirement for Northwest FCS "to provide prior notification or justification" for any future credit requests and did not provide an employee with an opportunity to object to future requests or revoke the credit authorization. *Id.* Higgins' email did not mention concerns she had over providing her social security number. *Id.* However, Higgins asserts generally that she had some trepidations about completing the form because she had previously had her identity stolen and she had concerns about whether Northwest FCS would adequately protect her personal information. Brown

responded to Higgins' email shortly thereafter, indicating he could not change the form and directing Higgins to speak with Zollinger or Wanda Todd in Human Resources if she still had concerns. *Id.* at 46.

On October 20, 2015, Brown sent an email to the last seven employees who had not returned the form, including Higgins, instructing them to complete the form by October 21, 2015. *Id.* at 51. Brown warned that he would "elevate th[e] matter to higher authorities after that time" if any employee failed to meet this deadline. *Id.*

By November 9, 2015, three employees, including Higgins, had still failed to fill out the form. *Id.* at 53. Brown emailed these employees and their supervisors, instructing them to return the forms "immediately." *Id.* One of these employees had left Northwest FCS's employment and the second employee completed the form within minutes. *Id.* at 7. Thus, as of November 9, 2015, Higgins was the only employee who had not completed and returned the required form. On November 10, 2015, Zollinger emailed Higgins telling her to complete the authorization form and to copy him when she emailed it to Brown. Dkt. 23-6, at 50.

On November 17, 2018, Todd asked Zollinger if Higgins had completed the form. Zollinger followed up with Higgins regarding the form. Higgins told him she had not yet submitted the form. Zollinger sent Higgins an instant message stating, "Come back to my office before you leave. I have been in discussion [sic] with both HR and Legal regarding the gravity of not signing the authorization. Much more vital to your continued employment than I think you are assuming . . ." *Id.* at 53. Zollinger then met with Higgins and communicated that "the authorization document is not subject to change and that it is

a non-negotiable requirement of her employment." *Id.* at 56. He communicated that if it was not signed and submitted by November 18, 2015, "then she has deliberately chosen not to comply with a requirement of employment and would be subject to termination." *Id.*

On November 18, 2015, at 2:27 p.m. Higgins emailed Human Resource Generalist Scott Carver a signed authorization form that did not provide her social security number, date of birth, or driver's license number. *Id.* at 62–63. Higgins maintains that she submitted an incomplete form because she did not have her wallet with her and did not have her prior address available at the time. At 3:38 p.m., Carver replied to Higgins' email and copied Zollinger, directing Higgins to "complete the form in its entirety and resend to me by the end of the day today." *Id.* at 65. Zollinger replied to the email chain at 3:54 pm stating, "I'll need to confirm that you have completed the form in its entirety and signed before you leave the office today." *Id.* at 67.

Higgins contacted her husband, who was able to locate her wallet and provide the requested information. Dkt. 25-1, at 14. At 3:59 p.m., Higgins responded to Carver's email with another copy of the authorization form. Dkt 23-6, at 70. On this form, Higgins included her former address, date of birth, and driver's license number. *Id.* at 71. Higgins still did not include her social security number. *Id.* In her email she explained, "The form states that my SSN is requested and not required."[5] *Id.* at 70. Higgins left the office on

---

[5] The form states, "In order for factual information to be obtained & reported, your date of birth and social security number are requested. This information is used solely for verification purposes in compliance with the Fair Credit Reporting Act." Dkt 23-6, at 71.

November 18, 2015, without providing a form with her social security number, despite Zollinger's "direct instruction to Higgins that she must complete the form in its entirely before she left the office." Dkt. 23-5, at 22.

On November 19, 2015, Zollinger attempted to contact Higgins in order to end her employment. *Id.* at 23. Zollinger sent Higgins a text message and email, and called her and left her a voicemail. *Id.* Higgins did not respond to any of these communication attempts. *Id.* Higgins's statement of disputed facts does not dispute that Zollinger attempted to contact Higgins. Dkt. 24-1.

Higgins had a scheduled prenatal appointment at 10:00 am on November 19, 2015, with Dr. Margaret Huggins. She worked from home for two hours that morning prior to the doctor's appointment. Higgins maintains that she did not want to admit to herself or her doctor that she was struggling with anxiety, headaches, and "other symptoms." Dkt. 24-3, at 4. Accordingly, she did not report this information to her doctor at that appointment. *Id.* Higgins' blood pressure was normal and Dr. Huggins noted that she was "doing well." Dkt. 23-7, at 91.

Higgins returned to Dr. Huggins' office that afternoon for an unscheduled appointment. Higgins states she returned to Dr. Huggins' office because she decided she needed to be honest with her doctor about her mental state and overall well-being. Dkt. 25-1, at 16. Dr. Huggins recalls Higgins was crying, distraught, and anxious, and that she reported suffering from insomnia. Dkt. 23-7, at 86–92. Dr. Huggins provided Higgins with a note that stated, "Please excuse from work for 2 weeks. Any questions please contact our office." Dkt. 24-6, at 3. Higgins emailed this note to Zollinger at 4:30 pm that

day. *Id.* at 1. In this email she stated, "I know there are matters pending on customer files and need to figure out how you would like me to handle them, hand them off, etc. while I am out." *Id.*

On the afternoon of November 20, 2015, Northwest FCS sent Higgins an email regarding her termination. It stated as follows:

> Based on your failure to respond to Lance Zollinger's multiple attempts to reach you by email, voice mail, and text yesterday, your failure to answer a call from Lance at 8:45 am MST this morning, and your subsequent email to Lance after that call asking that any urgent matters be emailed to you, this email is to notify you that your failure to fully and timely comply with the requirement to authorize Northwest FCS to obtain an investigative consumer report, including a credit check, by the extended deadline of 5:00 Mountain time on Wednesday, November 18, 2015, demonstrated your decision to resign from Northwest Farm Credit Services. Therefore, your final day of employment was November 18, 2015.

Dkt. 25-2, at 33. The parties disagree as to whether Higgins' last day of employment was November 18, 2015, or November 20, 2015. Northwest FCS paid Higgins through the end of November 2015.

Higgins filed this lawsuit on September 2, 2016. On September 12, 2017, Judge B. Lynn Winmill transferred this case to the undersigned. On January 24, 2018, Northwest FCS filed the pending motion for summary judgment on all claims. Higgins asserts nine causes of action: (1) gender discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); (2) gender discrimination in violation of the Idaho Human Rights Act ("IHRA"); (3) pregnancy discrimination in violation of Title VII; (4) pregnancy discrimination in violation of the IHRA; (5) failure to accommodate in violation of the Americans with Disabilities Act ("ADA"); (6) failure to accommodate in

violation of the IHRA; (7) disability discrimination in violation of the ADA; (8) disability discrimination in violation of the IHRA; and (9) violation of the Family and Medical Leave Act ("FMLA").

### III. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). In considering a motion for summary judgment, this Court must "view[] the facts in the non-moving party's favor." *Id.* To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in [his or her] favor." *Id.* (citation omitted). Accordingly, this Court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment; rather the respondent must set forth the "specific facts," supported by evidence, with "reasonable particularity" that precludes summary judgment. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

# IV. ANALYSIS

## A. Gender Discrimination Claims

### *1. The Applicable Law*

Title VII of the Civil Rights Act provides that it is unlawful for an employer to "discharge . . . or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). "The term 'because of . . . sex' includes pregnancy, childbirth or related medical conditions, and pregnant women should be 'treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work.'" *Kaiser v. Trace, Inc.*, 72 F. Supp. 3d 1126, 1131 (D. Idaho 2014) (quoting 42 U.S.C. § 2000e(k)). Thus, this Court treats the "pregnancy discrimination claim[s] as claim[s] for sex discrimination under Title VII." *Id.*

The Court analyzes Higgins' Title VII claims (for gender discrimination and pregnancy discrimination) through the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this analysis, a plaintiff must first establish a prima facie case of employment discrimination. *See Hawn v. Exec. Jet Mgmt.*, 615 F.3d 1151, 1155 (9th Cir. 2010). A plaintiff may establish a prima facie case based on circumstantial evidence by showing: (1) she is a "member[ ] of a protected class"; (2) she was "qualified for [the] position[ ] and performing [her] job satisfactorily"; (3) she "experienced adverse employment action[ ]; and (4) similarly situated individuals outside [her] protected class were treated more favorably, or other circumstances surrounding the

adverse employment action give rise to an inference of discrimination." *Id.* at 1156. A plaintiff need not always meet the above four-part test to establish a prima facie case; instead, a plaintiff can "provid[e] direct evidence suggesting that the employment decision was based on an impermissible criterion." *E.E.O.C. v. Boeing Co.*, 577 F.3d 1044, 1049 (9th Cir. 2009) (citing *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1148 (9th Cir. 1997)). "At summary judgment, the degree of proof necessary to establish a prima facie case is 'minimal and does not even need to rise to the level of a preponderance of the evidence.'" *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1037 (9th Cir. 2005).

If a plaintiff establishes a prima facie case, "[t]he burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action." *Hawn*, 615 F.3d at 1155. If the employer does so, the "plaintiff must then raise a triable issue of material fact as to whether the defendant's proffered reasons for [the adverse employment action were] mere pretext for unlawful discrimination." *Id.* To satisfy the burden for pretext, the plaintiff must "produce enough evidence to allow a reasonable factfinder to conclude either: (a) that the alleged reason for the discharge was false or (b) that the true reason for [her] discharge was a discriminatory one." *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918 (9th Cir. 1996).

The analysis of Higgins' IHRA claims for gender and pregnancy discrimination are "identical in all respects to the analysis of his Title VII claim." *Kamdem-Ouaffo v. Idahoan Foods, LLC*, 243 F. Supp. 3d 1130, 1141 (D. Idaho 2017); *Mackay v. Four*

*Rivers Packing Co.*, 179 P.3d 1064, 1069 (Idaho 2008) ("The purpose of the IHRA is to

provide for execution within the state of the policies embodied in the federal Civil Rights

Act of 1964, as amended . . . ."); *see also Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889

(9th Cir. 1994), *as amended on denial of reh'g* (July 14, 1994) ("[T]he analysis under

Title VII applies to claims under IHRA."). Therefore, if summary judgment is

appropriate on the Title VII claims, then summary judgment is also appropriate on the

corresponding IHRA claims. *Kamdem-Ouaffo*, 243 F. Supp. 3d at 1141.

## 2. Application

Higgins asserts that Northwest FCS violated Title VII and the IHRA when it

terminated her and paid her less than similarly-situated male employees.[6] The Court

begins with the claim of discriminatory termination.

Northwest FCS primarily asserts that it had a legitimate, non-discriminatory

reason for terminating Higgins. In fact, Northwest FCS begins its opening brief by

asserting that "[r]egardless of whether [Higgins] can establish a *prima facie* case of

employment discrimination, it is an ***absolute true fact*** that Higgins' separation of

employment had nothing to do with gender, disability, pregnancy, FMLA leave request

or any other protected status." Dkt. 23-1, at 5 (emphasis in original). In other words,

Northwest FCS does not try to argue that Higgins has not established a prima facie case.

---

[6] In her Complaint, Higgins specifically asserts that Northwest FCS violated Title VII and the
IHRA when it "failed to hire her for the [CO] position, paid her less than similarly-situated male
employees, failed to provide her with support staff, required her to travel frequently[,] and
terminated [her] employment." Dkt. 2, at 59. However, Higgins has clarified that she is only
asserting claims for discriminatory termination and unequal pay. The Court addresses the
unequal pay claims at the end of this decision.

Rather, Northwest FCS only focuses on its articulated nondiscriminatory reason for terminating Higgins: her failure to complete a required background check form in its entirety, in a timely manner, after it gave her multiple reminders and opportunities to do so, and her failure to respond to Zollinger's multiple attempts to contact her regarding her employment status. These reasons satisfy Northwest FCS's burden of articulating a "legitimate, nondiscriminatory reason for the challenged action." *Hawn*, 615 F.3d at 1155.

In response, Higgins cites several "circumstances" that she argues create questions of fact regarding Northwest FCS's true motivation for terminating her and taking other actions against her. The Court addresses each of these circumstances in turn.

<u>a. Northwest FCS's Treatment of Brent Fetsch</u>

Higgins first argues Northwest FCS's treatment of Brent Fetsch,[7] a male Northwest FCS employee who she asserts also failed to submit a complete authorization form, shows discrimination. Northwest FCS did not terminate Fetsch, or otherwise punish him, for this indiscretion. Higgins asserts that this is evidence of discrimination because it shows that Northwest FCS did not punish a male employee for the same conduct for which it fired her.

The record shows that on September 8, 2015,—the same day Northwest FCS sent out the authorization forms—Fetsch sent an email to Carver stating, "please consider this reply to be my signature and authorization. Northwest FCS HR has my address, birth

---

[7] Fetsch is the President of Northwest FCS in Oregon.

date, and SSN on file." Dkt. 25-4, at 3. Subsequently, a Northwest FCS employee, probably Brown, communicated to Fetsch that he needed to complete the authorization form. *Id.* at 3–4. On September 14, 2015, Fetsch's administrative assistant emailed Carver Fetsch's signed authorization form. *Id.* at 6. Fetsch had completed everything on the form—including social security number, date of birth, and driver's license number— except for his previous address. *Id.* at 7. Todd, from Northwest FCS's Human Resources Department, maintains that Northwest FCS did not become aware until "later" that Fetsch had not provided his previous address. Dkt. 23-3, at 11. Moreover, Northwest FCS did not consider this omission to be "material" because "previous address information is not needed for a credit check." *Id.* In contrast, Northwest FCS considered a failure to provide a social security number to be material because it is required to conduct a credit check. *Id.* at 8.

This evidence does not show "(a) that the alleged reason for [Higgins'] discharge was false or (b) that the true reason for [her] discharge was a discriminatory one." *Nidds*, 113 F.3d at 918. Fetsch's behavior was significantly different from Higgins', justifying a different response. First, Fetsch responded to the request in a timely manner. Fetsch initially responded within a day, and, after HR informed him that his response was insufficient, he responded again within a few days. In contrast, Higgins did not provide the requested form for almost two and a half months. Second, unlike Higgins, Northwest FSC did not need to remind Fetsch multiple times over multiple months to fill out the

form.[8] Third, Fetsch did not fail to respond to multiple communication attempts from other Northwest FCS employees regarding the form and his employment status. Finally, as explained above, Northwest FCS considered Fetsch's omitted previous address to be immaterial and Higgins' omission of her social security number to be material. This disparate treatment of the two pieces of information was justified as one was required to complete a background check and the other was not. For all of these reasons, the Court does not find Northwest FCS's unequal treatment of Higgins and Fetsch to be evidence of pretext.

### b. Zollinger's Comments

Higgins next argues that comments Zollinger, and others, made about her show the true reason for her discharge was discrimination. Specifically, Higgins alleges that when she announced she was pregnant Zollinger told her "that it was an unfortunate time, it was less than favorable conditions" because Northwest FCS was trying to grow the CHL market in Utah and Higgins was assigned to train and support new staff members who would sell CHL loans in Utah. Dkt. 25-1, at 17. In addition, Zollinger questioned "whether or not it was in [Higgins'] family's best interest for [her] to come back to work after [she] had [a] third child or whether [her family] would be better served by [Higgins] being a stay-at home mom and what the financial impacts of that would be adding a third

---

[8] Higgins asserts that, at first, she did not believe the emails regarding the background check form applied to her because she had recently completed a National Multistate Licensing System & Registry ("NMLS") certification process, which required an extensive background check, including finger printing. This belief, however, does not explain Higgins' failure to complete the form after Brown and Zollinger specifically reached out to her regarding the form over the course of several weeks.

child to [her] family." *Id.* at 22. Finally, Higgins asserts that some of her co-workers had described her as "abrasive and pushy." Dkt. 24, at 6.

Even if the Court assumes all of these allegations are true, these comments are insufficient to establish that the real reason for her discharge was a discriminatory one. At most, these comments are "'stray' remarks" that "are insufficient to establish discrimination." *See Merrick v. Farmers Ins. Grp.*, 892 F.2d 1434, 1438 (9th Cir. 1990); *Nunes-Baptista v. WFM Hawaii, LLC*, 585 F. App'x 611 (9th Cir. 2014) (finding comments made by Plaintiff's supervisor about her pregnancy were "stray remarks . . . insufficient to establish discrimination"); *Farina v. Compuware Corp.*, 256 F. Supp. 2d 1033, 1042 (D. Ariz. 2003) ("The questions about child care arrangements and working as a mother are neutral in context and do not show evidence of discrimination."). Moreover, to be direct evidence of discrimination, such comments must temporally or causally related to the adverse employment action. *Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705 (9th Cir. 1993) (finding comment that "[w]e don't necessarily like grey hair" was more than a "stray remark" but "was not tied directly to [plaintiff's] termination" and, thus, was "at best weak circumstantial evidence of discriminatory animus"); *see also Nidds*, 113 F.3d at 919. Higgins has failed to make these required connections.

The Seventh Circuit's decision in *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, is particularly instructive here. 140 F.3d 716, 723–25 (7th Cir. 1998) (cited in *Lam v. Univ. of Hawaii*, 164 F.3d 1186, 1187 (9th Cir. 1998), *as amended on denial of reh'g* (Feb. 2, 1999)). In that case, the plaintiff's supervisor made a comment, "if you were my wife, I would not want you working after having children." *Id.* "The comment was made

at least five months before plaintiff's termination and thus was not temporally related to her discharge. In addition, there was no causal nexus between the comment and plaintiff's discharge." *Id.* The court explained, "[t]o rise to the level of direct evidence of discrimination, . . . isolated comments must be contemporaneous with the discharge or causally related to the discharge decision making process." *Id.* (internal quotation marks and citation omitted). The court ultimately found the comment was "not sufficient to raise a genuine issue of material fact about the existence of discriminatory intent." *Id.* As in *Kennedy*, Zollinger's alleged comments were made months prior to Higgins' termination and there is no evidence that the comments were in any way connected to the decision to terminated her. In addition, the stray comments Higgins' coworkers made regarding her demeanor were also unconnected to her termination and do not demonstrate that the decision to terminate her was motivated by bias because her co-workers had no power over her employment status. In sum, the comments Higgins points to are insufficient evidence of discrimination for this claim to survive summary judgment.

<u>c. Passed Over for Promotion</u>

Higgins next argues Northwest FCS's decision to hire Macedo for the open CO position in 2014 instead of her shows gender animus. First, Higgins believes she was more qualified for the position than Macedo; she had a bachelor's degree and a master's degree in agricultural business, while Macedo had a bachelor's degree in communications and a minor in finance. In addition, Higgins had worked for Northwest FCS for two and a half years when she applied for the position, while Macedo was an outsider. Second, Higgins calls into question Northwest FCS's justification for hiring Macedo: his

expressed interest in transitioning into an RM. Higgins points out that the CO position description does not mention flexibility to transfer into a RM position. She also highlights the fact that Macedo never actually transitioned into a RM position.

The Court agrees with Northwest FCS that Higgins' "personal statements that [s]he was more qualified or the better candidate for the positions do[es] not create a material factual dispute." *See Hutchins v. DIRECTV Customer Serv., Inc.*, 963 F. Supp. 2d 1021, 1031 (D. Idaho 2013). Shortly after Northwest FCS made the hiring decision, Zollinger explained to Higgins that although her education qualifications were better than Macedo's, his background and experience made him an equally strong candidate. *See* Dkt. 23-5, at 32. Macedo came from an agricultural background, had "extensive applied experience in analyzing credit and making loan decisions through his [then] current loan officer role," and had a proven performance record as demonstrated through his interactions with Northwest FCS in his [then] current role. *Id.* The deciding factor was Macedo's enthusiasm about transitioning into an RM position. *Id.*

"It is the province of the employer, not the Court, to determine who is best qualified to hire for certain positions." *Hutchins*, 963 F. Supp. 2d at 1031. Northwest FCS has averred why it selected Macedo instead of Higgins. "None of these reasons are remotely suspect." *Id.* Higgins' qualifications do not "leap from the record and cry out to all who would listen that [she] was vastly—or even clearly—more qualified for the subject job." *Id.* (citation omitted). The fact that Macedo never actually became an RM also does not cast doubt on the legitimate reason Northwest FCS gave for selecting Macedo. A variety of reasons could have prevented Northwest FCS from promoting

Macedo to an RM, including that the need never arose. Moreover, other employees confirmed that DePell had always sought CO candidates who would be ready to transition into an RM position. Dkt. 24-7, at 6. In other words, the decision to select Macedo over Higgins because he had more role flexibility was not "unique." *Id.*

The Court also finds the "same actor-inference" applies here. Under this doctrine, "where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory action." *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1096 (9th Cir. 2005) (quoting *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270–71 (9th Cir. 1996)). Wilson, Zollinger, and DePell all had influence over the decision to hire Macedo over Higgins in May 2014, with DePell making the final call. These same individuals approved the creation of a new RM position for Higgins and promoted her into that position. These actions create a strong inference that the failure to hire Higgins for the CO position was not motivated by animus. Higgins fails to overcome this inference or explain why it does not apply.

Finally, Higgins asserts that Northwest FCS has only employed men in the sale staff in eastern Idaho for the last ten years. The Court hesitates to draw discriminatory inferences from this fact. In 2015, there were only eight RMs—including Higgins—in eastern Idaho. Higgins provides no information to give context to her argument. For example, she provides no information on how much turnover there was in RMs in eastern Idaho, how many positions had come open in the last 10 years, or the statistical makeup of the applicant pools for any open positions. Thus, the Court agrees with Northwest FCS

that, "[n]ot only is [Higgins'] sample size too small to have much, if any, predictive value, but her data does not account for possible nondiscriminatory variables." *See Harris v. Treasure Canyon Calcuim Co.*, 132 F. Supp. 3d 1228, 1242 (D. Idaho 2015).

In sum, the record does not show that Northwest FCS's decision to hire Macedo instead of Higgins was discriminatory. However, more importantly, Higgins has failed to tie this event to the decision to terminate her. Like with the allegedly discriminatory comments, Higgins must, in some way, tie the 2014 decision to hire Macedo to her termination in order for it to support her case. Higgins has not done so. Thus, even assuming Higgins' evidence shows some bias, Higgins has failed to show the proffered reason for terminating her was false or pretext for discrimination.

None of the "circumstances" Higgins has cited create a question of fact regarding Northwest FCS's true motivation for terminating her.[9] Because Higgins has failed to discredit the reasons Northwest FCS has given for her termination, the Court finds good cause to grant summary judgment in Northwest FCS's favor on the discriminatory discharge claims.

---

[9] Higgins also argues that Northwest FCS paid her less and forced her to work under less favorable conditions than her male colleagues. This argument is addressed in full at the end of this decision. As explained in that section, the Court finds that any difference in treatment was justified by legitimate, nondiscriminatory reasons. Moreover, Higgins has again failed to show how the alleged discriminatory, unequal pay shows that the decision to terminate her was motivated by animus.

<u>B. ADA Claims</u>

The Court next addresses Higgins' claims for discrimination and failure to accommodate brought under the ADA and IHRA.[10] "Discrimination . . . claims under the ADA are . . . subject to the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)." *Curley v. City of N. Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014) (citing *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49–50 & n. 3 (2003)). Similar to the previous claims, to establish a prima facie claim of disability discrimination under the ADA, Higgins must establish that she "(1) is disabled;[11] (2) is qualified with or without reasonable accommodation to perform the essential functions of the job; and (3) suffered an adverse employment action because of her disability." *French v. Idaho State AFL-CIO*, 164 F. Supp. 3d 1205, 1218 (D. Idaho 2016) (citing *Sanders v.*

---

[10] "The Idaho Supreme Court has held that the IHRA will be interpreted in a manner consistent with the ADA. *Loomis v. Heritage Operating, L.P.*, No. CV-04-617-S-BLW, 2006 WL 2228964, at *2 (D. Idaho Aug. 3, 2006) (citing *Foster v. Shore Club Lodge*, 908 P.2d 1228, 1232–33 (1995)). Thus, the Court will address the ADA and the IHRA claims together.

[11] Higgins asserts that her pregnancy complications necessitating bedrest was a disability. Whether Higgins was disable is a jury question. The ADA's relevant definition of "disability" is "a physical or mental impairment that substantially limits one or more of the major life activities . . . ." 42 U.S.C. § 12102; *Kaplan v. City of N. Las Vegas*, 323 F.3d 1226, 1231 (9th Cir.2003). Major life activities include, inter alia, "walking, breathing, learning, and working." 29 C.F.R. § 1630.2(h)(1). Some courts have "held that pregnancy, and pregnancy-related complications, do not qualify as 'disabilities' under the Acts." *Hogan v. Ogden*, No. CV-06-5078-EFS, 2008 WL 2954245, at *5 (E.D. Wash. July 30, 2008) (collecting cases). However, because "bed rest is not required during a normal pregnancy, it is a jury question as to whether Plaintiff's pregnancy constituted a physical impairment substantially limiting [a] major life activity." *Id.* Notably, "[t]he Ninth Circuit has yet to rule on whether pregnancy and related complications qualify as disabilities under the ADA." *McKellips v. Franciscan Health Sys.*, No. C13-5096MJP, 2013 WL 1991103, at *3 (W.D. Wash. May 13, 2013).

*Arneson Prods., Inc.*, 91 F.3d 1351, 1353 (9th Cir. 1996)). "The burden then shifts to the employer to provide a legitimate, nondiscriminatory (or nonretaliatory) reason for the adverse employment action. If the employer does so, then the burden shifts back to the employee to prove that the reason given by the employer was pretextual." *Curley*, 772 F.3d at 632.

The Ninth Circuit has recognized that a failure-to-accommodate claim "is analytically distinct from a claim of disparate treatment or impact under the ADA." *Dunlap v. Liberty Nat. Prod., Inc.*, 878 F.3d 794, 798 (9th Cir. 2017). However, an unlawful discharge claim under the ADA is often, "from a practical standpoint," the same as a failure to accommodate claim because the consequence of the failure to accommodate is frequently an unlawful termination. *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1139 (9th Cir. 2002).[12]

Under the ADA, an employer generally has a duty to make reasonable accommodations for "the known physical or mental limitations of an otherwise qualified employee." *U.S. E.E.O.C. v. UPS Supply Chain Sols.*, 620 F.3d 1103, 1110 (9th Cir. 2010) (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 396 (2002)). "[O]nce an employee requests an accommodation or an employer recognizes the employee needs an accommodation but the employee cannot

---

[12] "To establish a prima facie case for failure to accommodate under the ADA, [Higgins] must show that (1) [s]he is disabled within the meaning of the ADA; (2) [s]he is a qualified individual able to perform the essential functions of the job with reasonable accommodation; and (3) [s]he suffered an adverse employment action because of [her] disability." *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012) (internal quotation marks and citation omitted).

request it because of a disability, the employer must engage in an interactive process with the employee to determine the appropriate reasonable accommodation." *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002).

For the duty to accommodate to apply, the individual requesting the accommodation must be "an applicant or employee." *Id.* (quoting 42 U.S.C. § 12112(b)(5)(A)). It is this prerequisite on which the parties focus their briefs. Northwest FCS argues it terminated Higgins on November 18, 2015, before Higgins had submitted her request for medical leave. Higgins argues Northwest FCS did not terminate her until November 20, 2018, after she had submitted her request for accommodation. In doing so, Higgins asserts Northwest FCS failed to accommodate her disability and terminated her because of her disability. At the very least, Higgins argues, there is a question of fact as to which day Northwest FCS terminated her.

The parties have extensively discussed the evidence that supports a finding Higgins was either terminated on November 18 or November 20. When taken as a whole, there is a question of fact as to when exactly Northwest FCS discharged Higgins. However, this question of fact is not material to the ADA claims. No matter which day Northwest FCS terminated Higgins, her claims still fail. Higgins has failed to present any evidence that the reason Northwest FCS gave for her termination was false or pretext for discrimination. As explained previously, Northwest FCS terminated Higgins because she was the only employee, of several

hundred, that failed to fill out the authorization form with her social security number. Northwest FCS gave Higgins multiple reminders over several months that she needed to fill out the form. She had many opportunities to raise any issues she had with the form and with providing her social security number. Employees from the legal department, the human resources department, and her supervisor advised her of the importance of filling out the form and how her failure to do so would subject her to termination. Higgins still declined to fill out all material aspects of the form, which was a requirement of her continued employment. Higgins then did not respond to Zollingers' multiple attempts to communicate with her regarding her job status.

Northwest FCS had legitimate, nondiscriminatory reasons for terminating Higgins. As explained in the previous section, Higgins' attempts to call these reasons for termination in to question are unavailing. Moreover, Higgins has failed to present evidence that the real reason for her discharge was a discriminatory one based on her disability or on her request for accommodation. Most significantly, Northwest FCS did not receive notice that Higgins was asserting that she had a disability and that she was requesting an accommodation until after all of the events that lead to her termination took place. Higgins' last minute request for medical leave, particularly after she declined to respond to Zollinger's attempts to communicate with her, cannot save her claim. Simply put, nothing in the record shows Northwest FCS terminated her "because of her disability" or failed to

accommodate her disability. Accordingly, the Court finds good cause to grant the

Motion for Summary Judgment on the ADA and corresponding IHRA claims.

## C. FMLA Claims

The Court next turns to Higgins' FMLA claim. Higgins appears to assert both an

FMLA retaliation claim and an FMLA interference claim. However, the parties have not

distinctly delineated the requirements of each. The Court briefly addresses the retaliation

claim before turning to the interference claim.

An FMLA retaliation claim, like the previously discussed claims, requires

application of the *McDonnell Douglas* burden-shifting framework. *Bushfield v. Donahoe*,

912 F. Supp. 2d 944, 953 (D. Idaho 2012). As explained ad nauseam above, Northwest

FCS has provided a legitimate reason for terminating Higgins. Higgins has failed to show

this reason is false or that the true reason was discriminatory. This analysis does not

change in the context of the FMLA claim. There is no evidence to show Northwest FCS

fired Higgins because she requested FMLA leave. Like with the ADA claims, all of the

events that lead to Higgins' termination occurred before she requested FMLA leave.

Thus, this claim cannot survive summary judgment.

The FMLA guarantees an "eligible employee" twelve work weeks of leave each

year "[b]ecause of a serious health condition that makes the employee unable to perform

the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Under 29

U.S.C. § 2615(a)(1), it is "unlawful for any employer to interfere with, restrain, or deny

the exercise of or the attempt to exercise' the substantive rights guaranteed by FMLA."

"When a party alleges a violation of § 2615(a)(1), it is known as an 'interference' or

'entitlement' claim." *Sanders v. City of Newport*, 657 F.3d 772, 777–78 (9th Cir. 2011).

The Ninth Circuit does not apply the *McDonnell Douglas* burden-shifting framework to

FMLA interference claims. *Id.* Instead, an employee need only establish that: "(1) he was

eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he

was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to

take leave, and (5) his employer denied him FMLA benefits to which he was entitled." *Id.*

Northwest FCS again focuses on Higgins' termination date and argues Higgins

was not entitled to FMLA leave because it had already terminated Higgins when she

requested the leave. *See Walls v. Cent. Contra Costa Transit Auth.*, 653 F.3d 963, 966

(9th Cir. 2011) ("FMLA rights and benefits are contingent upon the existence of an

employment relationship."). Higgins argues again that there is a dispute of material fact

regarding what day Northwest FCS discharged her. She maintains that if Northwest FCS

fired her on November 20, after she requested FMLA leave on November 19, she will

succeed on her claim because "[a] violation of the FMLA simply requires that the

employer deny the employee's entitlement to FMLA leave." *Xin Liu v. Amway Corp.*,

347 F.3d 1125, 1135 (9th Cir. 2003).

The Court, again, finds fault in Higgins' argument. There is no evidence that

Northwest FCS explicitly denied Higgins FMLA leave. Rather, it appears Northwest FCS

merely continued "pursuing a disciplinary course of action against [Higgins] that began

before [she requested] FMLA-related leave." *Swan v. Bank of Am.*, 360 F. App'x 903,

906 (9th Cir. 2009). Thus, even assuming Northwest FCS terminated Higgins on

November 20, Northwest was not required to change its decision to terminate Higgins

simply because she requested FMLA leave. In addition, "an employer may still terminate an employee during her leave if the employer would have made the same decision had the employee not taken leave." *Gambini v. Total Renal Care, Inc.*, 486 F.3d 1087, 1097 (9th Cir. 2007). Northwest FCS was not required to explicitly grant Higgins her requested leave if it was simply going to terminate her immediately thereafter for a legitimate reason unrelated to her requested leave. Finally, the record contains no evidence that Northwest FCS considered the requested FMLA leave as a "negative factor" in its decision to terminate Higgins. *See Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001). Rather, Northwest FCS had already decided to terminate Higgins when she requested the leave. Accordingly, Higgins FMLA interference claim also fails to survive summary judgment.

## D. Pay Disparity Claims

Finally, the Court turns to Higgins' pay disparity claims. Higgins has clarified that she is asserting a pay disparity claim under Title VII, and not a claim under the Equal Pay Act. These are two distinct causes of action and a brief delineation of the differences is helpful.

"In an Equal Pay Act case, the plaintiff has the burden of establishing a prima facie case of discrimination by showing that employees of the opposite sex were paid different wages for equal work." *Stanley v. Univ. of S. Cal.*, 178 F.3d 1069, 1073–74 (9th Cir. 1999). "The prima facie case is limited to a comparison of the jobs in question, and does not involve a comparison of the individuals who hold the jobs." *Id.* at 1074 (citation omitted). "Significantly, under the Act, the plaintiff need not demonstrate that the jobs in

question are identical; she must show only that the jobs are substantially equal." *Id.* "The Equal Pay Act creates a type of strict liability; no intent to discriminate need be shown." *Maxwell v. City of Tucson*, 803 F.2d 444, 446 (9th Cir. 1986) (internal quotation marks and citation omitted).

Title VII also contains a "prohibition on discriminatory wages." *Lewis v. Smith*, 255 F. Supp. 2d 1054, 1060 (D. Ariz. 2003); 42 U.S.C. § 2000e–2(a) (making it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" or to "limit, segregate, or classify his employees or applicants for employment" on the basis of sex). "Equal pay claims asserted under Title VII must satisfy the same substantial equality test applied to claims asserted under the EPA." *Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988). However, plaintiffs may alternatively succeed on a "disparate treatment" theory. *Id.*

"Under a disparate treatment theory, proof of an employer's intent to discriminate is an essential element of a plaintiff's prima facie case."[13] *Id.* Thus, although "Title VII contains a broader prohibition on discriminatory wages than that mandated by the Equal Pay Act," "the Plaintiff bears a higher burden at the prima facie stage of a Title VII claim [because] he must show some evidence of intentional discrimination in addition to

---

[13] "To establish a prima facie case of disparate treatment discrimination Harris must show: '(1) she belongs to a protected class; (2) she was qualified for the position; (3) she was subjected to an adverse employment action; and (4) similarly situated men were treated more favorably . . . .'" *Harris v. Treasure Canyon Calcuim Co.*, 132 F. Supp. 3d 1228, 1243 (D. Idaho 2015) (quoting *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061–62 (9th Cir. 2002)).

evidence of a wage disparity for similar work." *Lewis*, 255 F. Supp. 2d at 1060–61. "A plaintiff alleging discrimination under a disparate treatment theory cannot merely show that an employer was aware that a given policy would lead to adverse consequences for a given group. A plaintiff must show that an employer chose the particular policy because of its effect on members of a protected class." *Forsberg*, 840 F.2d at 1418 (internal citations omitted).

"Once the plaintiff establishes a prima facie case," under either the Equal Pay Act or Title VII on a disparate pay theory, "the burden of persuasion shifts to the employer to show that the wage disparity is permitted by one of the four statutory exceptions to the Equal Pay Act: '(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.'" *Rizo v. Yovino*, 854 F.3d 1161, 1164 (9th Cir.), *reh'g en banc granted*, 869 F.3d 1004 (9th Cir. 2017); *Maxwell*, 803 F.2d at 446 ("Title VII incorporates the Equal Pay Act defenses, so a defendant who proves one of the defenses cannot be held liable under either the Equal Pay Act or Title VII.").

Higgins argues Northwest FCS paid her less and subjected her to more difficult working conditions than her male colleagues. Higgins compares herself directly to several male employees in eastern Idaho and the surrounding area. In response, Northwest FCS maintains that it had legitimate reasons for paying Higgins less than the identified male co-workers. Northwest FCS also argues that in 2015, in the state of Idaho as a whole, Northwest FCS employed nine RM I employees (including Higgins), three of which were women. Northwest FCS points out that Higgins made more than two male

RM I employees in Idaho and all the RM I employees that made more than Higgins had more sales experience than her.

In early 2014, Higgins was making $38,000 as an FS I. In late August 2014, Higgins moved into a FS II role as part of her transition into the CHL RM. Higgins received a mid-year 15% raise to $44,160. At the time, the other FS IIs with similar tenure made about $42,240. On March 1, 2015, Northwest FCS promoted Higgins into the CHL RM position (an RM I position) and gave her a raise to $50,000. Northwest FCS presented evidence that it planned to increase Higgins' salary again, to $56,000 or $57,500, during the next annual compensation adjustment in March 2016. This never occurred because Northwest FCS terminated Higgins.

Higgins first compares herself to Dustin Orr, who she asserts made more than her even though she had more experience and more education. Northwest FCS hired Orr in 2011 as a CO trainee just after he received a bachelor's degree. He became an RM I in March 2013 with a starting salary of $50,000. A year later, Northwest FCS gave him a raise to $55,000. A year after that, in March 2015, Northwest FCS promoted him to Branch Manager and gave him a raise to $60,500. Significantly, this occurred shortly after Bank of Idaho offered Orr a position with a significantly higher salary. Northwest FCS has continued to give Orr a yearly raise since that time.

A comparison of Northwest FCS's treatment of Orr and Higgins does not show disparate treatment. Northwest FCS paid Orr and Higgins the same salary ($50,000) when they were promoted into RM I positions. Northwest FCS, justifiably, paid Orr more

as he accumulated experience, took on more responsibilities as Branch Manager, and considered leaving to pursue more lucrative opportunities.

Higgins next asserts that Northwest FCS paid Cody Montgomery more than her, even though he had less schooling, less training, and no experience working with Northwest FCS. Northwest FCS hired Montgomery in late 2015 as an RM I to sell CHLs in Northern Utah. His starting salary was $60,000. Northwest FCS asserts Montgomery's prior experience justified the $10,000 difference in starting salary between Montgomery and Higgins. Prior to joining Northwest FCS, Montgomery was a Vice President of Sales for a personal finance consulting company in Salt Lake City, where he supervised 80 salespersons. He also had six years of sales experience when he joined Northwest FCS. In comparison, Higgins had no direct sales experience when she became an RM I. All of these reasons for disparate pay appear legitimate and non-discriminatory.

Higgins next compares herself to Jordan Jacobs, another individual she asserts Northwest FCS paid more even though he had less schooling, less training, and no experience working with Northwest FCS. Northwest hired Jacobs in January 2016 to fill the CHL RM I position vacancy left by Higgins. Jacobs had interviewed for the CHL RM I position in Utah. Northwest FCS offered the Idaho position to Jacobs after it gave the Utah CHL position to Montgomery. Northwest FCS initially paid Jacobs $57,500. Northwest FCS asserts this salary was justified because Jacobs had previous sale experience with multiple lenders. Moreover, Northwest FCS asserts that it simply paid Jacobs the salary it had budgeted to pay Higgins at the next compensation adjustment.

Again, these reasons appear legitimate, non-discriminatory, and consistent with Northwest FCS's policy of paying higher wages for more sales experience.

Finally, Higgins compares herself to Macedo. Northwest FCS paid Macedo $63,497 when it hired him as a CO. Higgins and Macedo are not clearly comparable as they held different positions with different responsibilities. Northwest FCS also asserts that it paid Macedo more initially because he was making $59,000 in his previous position and had a good chance of receiving a promotion, with which he expected to make over $70,000. Considering the unequal comparison and Northwest FCS's justification, the Court finds Northwest FCS's differential treatment of Higgins and Macedo was "based on a[] factor other than sex.'" *Rizo*, 854 F.3d at 1164.

In sum, Northwest FCS has explained and justified any pay disparities. As Northwest FCS repeatedly emphasizes, Higgins did not have sales experience when she transitioned in to the RM I role. All of the other employees she compares herself to received higher salaries because they had more sales experience than she did. In addition, Higgins insists that Northwest FCS should have given her academic credentials and her experience as an FS with Northwest FCS more weight. Northwest FCS was not required to do so; it was completely permissible for Northwest FCS to primarily value sales experience and set its employees' salaries based on that metric. This system does not evidence impermissible disparate treatment among similarly situated employees.

Higgins also argues that when she moved into the CHL RM position, she had to build her portfolio from scratch, she had to travel more than other RMs and she did not have onsite administrative support. Higgins asserts that all of these factors made the

position more difficult that the other RM positions and that her compensation should have been higher as a result. In response, Northwest FCS does not dispute that Higgins faced these difficulties; but explains that these challenges came with the brand new position it created for her and that Higgins was well aware of these challenges when she took the position. Because Higgins had to build her portfolio from scratch, her portfolio was not as valuable initially and Northwest FCS could not afford to pay her as much as other RMs with fully developed portfolios or afford to give her a full-time FS to support her administratively. Moreover, the CHLs Higgins was selling, which are capped at $269,000, were less valuable than most of the loans the other RMs were selling. All of these facts tend to show Northwest FCS's disparate treatment of Higgins was based not on her gender, but on difference in what her (brand-new, untested) position required.

Finally, it is important to note that Higgins has failed to point to evidence of intentional discrimination—a necessary element of her Title VII pay disparity claim. Higgins cannot "merely show that [Northwest FCS] was aware that a given policy would lead to adverse consequences for a given group." *Forsberg*, 840 F.2d at 1418. Rather, she is required to "show that [Northwest FCS] chose the particular policy because of its effect on members of a protected class." *Id.* Higgins has not done so. For this reason, and all the other reasons given above, summary judgment on Higgins' unequal pay claims is appropriate.

///
///
///

## V. ORDER

THE COURT HEREBY ORDERS:

1. Defendants' Motion for Summary Judgment (Dkt. 23) is GRANTED.

2. Plaintiff's Motion to Strike (Dkt. 29) is GRANTED.[14]

3. The Court will enter judgment separately in accordance with Fed. R. Civ. P. 58.

DATED: May 1, 2018

David C. Nye
U.S. District Court Judge

---

[14] On March 12, 2018, Higgins filed a Motion to Strike supplemental declarations Northwest FCS submitted with its reply brief. Dkt. 29. The Court did not consider these supplemental declarations in reaching its decision.